M. Elizabeth Graham (SBN 143085)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
egraham@gelaw.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KENNETH BRUCE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff<br><br>v.<br><br>INTUIT INC., SASAN K. GOODARZI, and SANDEEP S. AUJLA,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Kenneth Bruce ("Plaintiff"), by and through his undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by Plaintiff's attorneys, which included a review and analysis of: (a) reports and other documents publicly filed by Intuit Inc. ("Intuit" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and other public statements issued by and disseminated by the Company; (c) analyst reports and media reports concerning the Company; and (d) other publicly available information regarding the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a securities class action brought on behalf of all persons and entities who purchased or otherwise acquired Intuit common stock between February 25, 2025 and June 1, 2026, inclusive (the "Class Period"). Plaintiff brings this action under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act") against Intuit and certain of its senior officers to recover damages caused by Defendants' violations of the federal securities laws.

2. Intuit is a global financial technology company that provides software and services to consumers, small and mid-market businesses, and accounting professionals. Throughout the Class Period, Defendants portrayed Intuit as uniquely positioned to benefit from the rapid adoption of generative artificial intelligence ("GenAI"), repeatedly assuring investors that the Company's AI-driven platform, AI-enabled human experts, and integrated ecosystem of products, including TurboTax, QuickBooks, Credit Karma, and Mailchimp, provided a durable competitive advantage that GenAI could not replicate. Defendants further assured investors that Mailchimp, the email marketing platform Intuit acquired for approximately $12 billion in 2021, was successfully executing a turnaround and remained on track to return to double-digit growth.

3. These statements were materially false and misleading because Defendants concealed that GenAI was already placing significant competitive pressure on Intuit's core businesses, particularly TurboTax, undermining the Company's ability to sustain the growth,

pricing, and profitability investors had come to expect. Defendants likewise concealed that Mailchimp was failing to deliver the growth and strategic benefits Defendants repeatedly touted, including through its integration with QuickBooks, and would not return to double-digit growth as represented.

4. The truth emerged on May 20, 2026, when Intuit reported disappointing third quarter fiscal 2026 results, disclosed that it had suffered a significantly weaker-than-expected tax season because price-sensitive do-it-yourself ("DIY") tax filers increasingly chose not to use TurboTax, and announced a sweeping restructuring that included approximately 3,000 job cuts and approximately $300 million to $340 million in restructuring charges. Intuit also revealed that it was reducing its investment in Mailchimp, contradicting Defendants' repeated assurances that the business was on track to return to double-digit growth.

5. The market reacted swiftly to these disclosures. On May 21, 2026, Intuit's stock price fell approximately 20%, erasing more than $20 billion in market capitalization in a single trading day. The decline continued following a June 2, 2026 downgrade by Goldman Sachs, which cited growing competitive threats from lower-priced GenAI-powered tax services and concerns regarding Mailchimp's growth trajectory. As a result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered substantial losses.

## II. JURISDICTION AND VENUE

6. The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because Intuit is headquartered in this District, Defendants conduct business in this District, and substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

9. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Plaintiff

10. Plaintiff, as reflected in the Certification submitted herewith, purchased Intuit common stock at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

11. Defendant Intuit is headquartered in Mountain View, California, and is known for its financial software for consumers, accountants, and small businesses, including popular brands such as QuickBooks, TurboTax, Mailchimp, and Credit Karma. Intuit's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "INTU."

12. Defendant Sasan K. Goodarzi ("Goodarzi") has served as the Chief Executive Officer ("CEO") of Intuit since January 1, 2019.

13. Defendant Sandeep S. Aujla ("Aujla") has been the Chief Financial Officer ("CFO") of Intuit since August 1, 2023.

14. Goodarzi and Aujla are collectively referred to as the "Individual Defendants." The Individual Defendants, together with Intuit, are referred to as "Defendants."

15. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Intuit's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and investors (i.e., the market). The Individual Defendants were provided with copies of Intuit's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and approved or ratified the statements therein and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, their direct participation in the management of the Company, their direct involvement in the day-to-day

operations of the Company, and their access to material, nonpublic information available to them, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew or recklessly disregarded that the positive representations being made were then materially false.

## IV. SUMMARY OF THE FRAUD

16. Intuit is a global financial technology company that provides software and services to consumers, small and mid-market businesses, and accounting professionals. Through products including TurboTax, QuickBooks, Credit Karma, and Mailchimp, the Company offers tax preparation, accounting, payroll, payments, personal finance, marketing automation, and other financial management solutions.

17. Before and throughout the Class Period, Intuit faced an increasing competitive threat from the widespread adoption of GenAI tools, such as ChatGPT and Claude, which some commentators speculated would soon reduce demand for Intuit's higher-priced subscription-based products by enabling consumers and small businesses to perform many of the same functions at a fraction of the cost. Rather than acknowledging this threat, however, Intuit falsely represented that AI was a tailwind rather than a competitive threat, that the Company's AI-driven platform and AI-enabled human experts provided a unique competitive advantage that GenAI could not replicate, and that its AI strategy would drive higher growth, greater efficiencies, and durable long-term growth.

18. At the same time Intuit was making false and misleading statements about the impact of AI on its business prospects, the Company also concealed that its $12 billion acquisition of email marketing platform Mailchimp was failing to deliver the growth and strategic benefits Defendants had promised, including through its integration with QuickBooks. When Intuit acquired Mailchimp in 2021, it was at the center of the Company's small-business strategy and was considered its "crown jewel." Although Intuit acknowledged certain recent underperformance at Mailchimp, it continued to project double-digit growth for the business while concealing the full extent of Mailchimp's operational difficulties, integration challenges, and deteriorating growth trajectory.

19. The truth emerged in May 2026, when Intuit disclosed significantly slower-than-expected growth and announced a sweeping restructuring that included the elimination of approximately 3,000 positions and expected charges of approximately $300 million to $340 million. Intuit also revealed that it would "rightsize" its investment in Mailchimp after the business failed to achieve the growth Defendants had repeatedly touted. These disclosures stood in stark contrast to Intuit's repeated assurances throughout the Class Period that AI would drive higher growth and greater efficiencies and that Mailchimp was on track to return to double-digit growth.

20. In response to these disclosures, Intuit's stock price fell more than 20% in a single trading day to $307.07 per share—its largest one-day decline in more than two decades. The stock has continued to underperform, declining more than 50% year-to-date while comparable technology indexes have gained value. In fact, since reaching a high of more than $807 per share in late July 2025, Intuit's stock price has fallen 68%, wiping out billions of dollars in market capitalization, while the S&P 500 Information Technology Index has gained by 32%.

21. Compounding these allegations, Intuit insiders sold an extraordinary number of shares during the Class Period. Three insiders alone sold more than 860,000 shares for proceeds of approximately $570 million in less than a year. Most notably, Scott Cook, Intuit's billionaire co-founder, former CEO, and current Board member, accounted for 795,000 of those shares, generating proceeds of more than $525 million. The remaining sales were made by Individual Defendants CEO Goodarzi and CFO Aujla, who were uniquely positioned to know about the adverse information that Intuit concealed.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS[1]

22. Throughout the Class Period, Defendants repeatedly assured investors that the widespread adoption of GenAI posed no threat to Intuit because the Company had developed a unique, differentiated AI-driven platform that GenAI could not replicate and was uniquely positioned to benefit from the growing adoption of AI. Defendants also continued to tout

[1] All emphasis is added.

Mailchimp as integral component of Intuit's platform while concealing material adverse facts concerning Mailchimp's deteriorating growth prospects and its failure to deliver the strategic benefits Defendants repeatedly represented, including through its integration with QuickBooks

23. At the start of the Class Period, during Intuit's second quarter fiscal 2025 earnings call on February 25, 2025, Goodarzi assured investors that Intuit was "***making strong progress across our platform*** with our data and AI investments to deliver done-for-you experiences with AI-powered human expertise." Goodarzi further touted Intuit's supposedly differentiated platform, stating that "***as one consumer platform with a seamless customer experience*** across TurboTax and Credit Karma, we have incredible scale to win in the DIY and assisted categories."

24. During the same earnings call, Aujla similarly touted Mailchimp's revenue growth and integration into Intuit's platform, stating that Intuit "***remain[s] confident in, and [is] executing on, our vision of an end-to-end business platform that integrates the power of Mailchimp and QuickBooks services***. This is enabling our customers to both run and grow their business, all in one place."

25. In the Form 10-Q filed that same day, Defendants reiterated that Intuit had "made an early bet on AI" and touted its "AI-driven expert platform strategy," which embedded AI capabilities alongside live human experts. Defendants further represented that this strategy positioned the Company "for durable growth" and provided Intuit with a "***significant advantage as we deliver reimagined customer experiences***."

26. About one week later, at an investor conference on March 4, 2025, Aujla acknowledged that Intuit had taken its "eye off the ball" with Mailchimp's core small-business customers, but assured investors that the Company had refocused its efforts and would return Mailchimp "***to solid, double-digit healthy growth rates . . . in the coming quarters***."

27. At the same investor conference, Aujla acknowledged that Intuit had previously "lost customers on the DIY side, particularly about 1.5 million customers that were simple filers," but assured investors that the Company had identified the cause of those losses and successfully addressed the issue. Specifically, Aujla stated that those "learnings . . . informed our strategy this year," which was "focused on delivering phenomenal experience at a

competitive price and speed of getting the taxes done and getting money in their pocket." According to Aujla, Intuit was "using AI to deliver a very customized, almost a bespoke solution," employing "a very surgical AI-based approach" to determine "the right lineup" for each customer, including offering lower-priced options, and represented that "[t]hat's resonating."

28. On May 22, 2025, Intuit announced its financial results for the third quarter of fiscal 2025 and portrayed its AI strategy and integrated platform as key competitive advantages that were driving growth and positioning the Company to capitalize on advances in AI. Specifically, Goodarzi told investors:

> We have exceptional momentum with outstanding performance across our platform. ***We're redefining what's possible with AI by becoming a one-stop shop of AI-agents and AI-enabled human experts to fuel the success of consumers and small and mid-market businesses*** . . . We had an outstanding year in tax, including a significant acceleration in TurboTax Live revenue growth as we disrupt the assisted tax category.

29. Defendants reinforced these assurances during Intuit's third quarter fiscal 2025 earnings call on May 22, 2025. During the call, an analyst specifically asked whether the Company's staffing levels remained appropriate given the efficiencies created by AI, asking: "how persistent is the current level of headcount? Because to some extent, you're starting to reap the benefits of AI from an efficiency gain perspective." In response, Aujla assured investors that "***AI and efficiencies***" would "***continue to expand margins***," that "***we have the right level of staffing***," and that ongoing AI efficiencies would allow Intuit to "reduce our scaling of headcount less than what would have been without these efficiencies in the years to come."

30. Days later, at an investor conference on May 28, 2025, Aujla explained that the "combination of artificial intelligence and human intelligence working together" delivered a "differentiated experience" that contributed to "meaningful improvements" in productivity and positioned Intuit for "durable growth" despite the emergence of GenAI.

31. On the August 21, 2025 earnings call regarding Intuit's fourth quarter fiscal 2025 results, Goodarzi continued to portray Intuit's AI strategy as a major competitive advantage. Specifically, Goodarzi represented that Intuit's recently launched AI agents were "dramatically

improving how businesses run and grow," and that Intuit was already "seeing strong traction," with "customer engagement in the millions and repeat usage rates significantly above our expectations, demonstrating the value that we're providing to our customers." Goodarzi further assured investors that GenAI-powered search "***actually plays into our favor***," explaining that AI-generated search represented only "1%" of Intuit's overall traffic and that the Company's brands enjoyed significantly greater visibility on those platforms.

32. During the same call, Defendants continued to assure investors that Mailchimp was on track for a significant turnaround. Although Goodarzi acknowledged that "Mailchimp is a drag on our growth," he represented that the Company expected Mailchimp to "***exit fiscal 2026 growing double digits***." According to Goodarzi, Intuit was "seeing green shoots" in the business, including "the highest customer satisfaction…since we've acquired the business," while Aujla likewise assured investors that the Company's offering for small businesses was "resonating" and that management remained "***confident in this business exiting double digit this fiscal year***."

33. On September 3, 2025, Intuit filed an annual report on Form 10-K with the SEC, reporting its financial results for the fourth quarter and fiscal year ended July 31, 2025 ("2025 10-K"). In the 2025 10-K, Defendants stated that they "***have a significant competitive advantage with our scale of data, data services, AI capabilities, ecosystem of applications, and our large network of AI-enabled human experts to become the all-in-one platform for consumers, businesses, and accountants***." The 2025 10-K further stated that Intuit has "driven ***significant momentum*** across the company over the past year" and is "doubling down on the areas that drove strong results this year where the combination of AI and human intelligence delivers done-for-you experiences, helps customers put more money in their pockets, and build our mid-market businesses."

34. On September 10, 2025, Aujla continued to tout Intuit's AI strategy as a significant competitive advantage. Aujla stated that Intuit would continue "to double down on delivering done-for-you experiences using AI and AI-empowered human experts," adding that "***our results are showing that that's a true competitive differentiation, AI and HI, human intelligence, working together***." Aujla also dismissed concerns that generative AI tools posed a

meaningful competitive threat to TurboTax. Responding to a question about whether ChatGPT or similar tools could disrupt Intuit's tax business, Aujla asserted that customers would continue to rely on TurboTax because "those are the complexities that LLM cannot address," explaining that taxpayers instead required "a fully thought through tax engine, a tax experience to really deliver," which Aujla characterized as Intuit's "competitive differentiation."

35. On November 20, 2025, in a press release announcing Intuit's first quarter fiscal 2026 results, Defendants again reiterated that the Company's "strong first quarter of fiscal 2026" was "***driven by continued momentum across the company***."

36. Defendants continued making similar representations into 2026. During Intuit's second quarter fiscal 2026 earnings call on February 26, 2026—just one quarter before the truth emerged—Goodarzi responded to analysts' concerns regarding GenAI disruption by claiming that Intuit operated in "a category of one" because its "***customers demand[ed] human expertise***" rather than purely AI-powered software. Just days later, during a March 2, 2026 investor conference, Goodarzi doubled down, stating that "***the combination of AI and HI [human intelligence] is actually what's unlocking the growth that we are experiencing***," because Intuit's customers "demand expertise," and that "it's the combination of those 2 that's driving the growth." Goodarzi further assured investors that Intuit was "excited about not just the quarter, but the years to come."

37. The statements in ¶¶ 23–36 were materially false and misleading when made because Defendants concealed that GenAI was already placing significant pressure on Intuit's core businesses, particularly TurboTax, undermining the Company's ability to sustain the growth rates, pricing, and profit margins investors had come to expect. Defendants likewise concealed that Mailchimp was failing to deliver the growth and strategic benefits they repeatedly touted, including through its integration with QuickBooks, and that Mailchimp would not return to double-digit growth as represented, ultimately forcing Intuit to reduce its investment in the business.

## VI. THE TRUTH IS REVEALED

38. On May 20, 2026, Defendants were forced to reveal the truth. Intuit shocked investors by reporting third quarter fiscal 2026 financial results that fell well below expectations and announcing a massive restructuring intended to "simplify" the Company's organizational structure. As part of the restructuring, Intuit announced that it would "reduce its full-time work force by approximately 17%" and incur "approximately $300 to $340 million in restructuring charges." Defendants further admitted that, despite touting only two months earlier that they were "winning" in tax, the Company "did not have the overall tax season [it] expected," had "lost on price" among "the most price-sensitive DIY [do-it-yourself] filers," and would need to fundamentally rethink its DIY business model to regain those customers.

39. Defendants also revealed that Intuit had abandoned efforts to restore Mailchimp to its prior growth trajectory. As part of the sweeping restructuring announced that day, Intuit disclosed that it would reduce its investment in Mailchimp, confirming that the Company no longer intended to pursue the growth strategy for the business that Defendants had previously touted. Consistent with that shift, Defendants explained during the May 20, 2026 earnings call that Intuit was "rightsizing [its] investment in Mailchimp" in light of its continued underperformance.

40. On that same May 20, 2026 earnings call, Defendants further admitted that the restructuring was not a reaction to a recent development, but rather the culmination of longstanding operational problems the Company had been evaluating for over a year. Specifically, Goodarzi explained that Intuit had "been really studying for the last year" the Company's "biggest blockers and what's getting in our way," which ultimately led to the 17% workforce reduction. Goodarzi explained that the restructuring was driven by, among other things: (i) the elimination of management layers and "coordination-heavy roles"; (ii) the removal of duplicative positions following the integration of TurboTax and Credit Karma; and (iii) "sizing and resizing Mailchimp in context of the growth opportunities ahead." Goodarzi further acknowledged that Intuit intended to redirect resources toward its "growth engines" while

reworking its DIY tax business to address the Company's inability to "win" among customers earning less than $50,000.

41. These disclosures stood in stark contrast to Defendants' repeated Class Period representations about the strength of Intuit's business, the Company's tax performance, the competitive advantages of its AI strategy, and the growth prospects for Mailchimp. The market immediately recognized the inconsistency between Defendants' prior assurances and the truth revealed on May 20, 2026, with analysts criticizing management's prior messaging and lack of candor. For example, Barclays stated that the "bigger issue" was "management being very bullish going into Q3 results, which created an expectations mismatch." Likewise, Deutsche Bank observed that Intuit's disappointing results "rais[ed] several questions about the company's structural growth and profitability from here," and noted that "[t]hese results especially surprised investors relative to confident messaging from management intra-quarter."

42. Analysts likewise questioned Defendants' insistence during the May 20, 2026 earnings call that "none of this has anything to do with AI." For example, Evercore commented that, "while Intuit pushed back on AI as the culprit, the burden of proof now shifts to the company to demonstrate next tax season that the issue was simply price elasticity" rather than "early evidence of AI-enabled disintermediation of the DIY tax workflow." Similarly, TD Cowen reported that the results were "apt to fuel skepticism regarding AI disruption risks," while UBS noted that, although Intuit had "maintain[ed] that AI was not a driver of the weakness," former Intuit employees had indicated that "the rise of rivaling offerings and ability to use AI to address some tax Qs could increasingly pressure pricing, demand for assisted 'do-it-with-me' and DIY share." Industry observers likewise viewed the restructuring as evidence that Intuit was confronting mounting AI-related competitive pressures, with one publication reporting that the Company's 17% workforce reduction reflected a "brutal reality" that GenAI "might make its flagship products obsolete" and that what had one appeared to be "a distant theoretical threat has become an immediate existential crisis."

43. In response to these disclosures, Intuit's common stock price plummeted 20% from $383.93 per share on May 20, 2026 to $307.07 per share at the close of trading on May 21, 2026, erasing more than $20 billion in market capitalization in a single trading day.

44. The market's reassessment of Intuit continued in the days that followed. On June 2, 2026, Intuit's stock price declined an additional approximately 9% after Goldman Sachs downgraded the stock from Neutral to Sell and slashed its 12-month price target from $519 to only $276 per share, warning that "fundamentals may get worse before they get better." Although Intuit's stock price had partially recovered following the May 20, 2026 corrective disclosures, the Goldman downgrade caused the stock to fall from $353.76 per share on June 1, 2026, to $322.14 per share on June 2, 2026—a decline of $31.62 per share that erased $8.5 billion in market capitalization.

45. Goldman attributed its downgrade in significant part to the growing competitive threat posed by lower-priced, GenAI-powered tax services, including Prime Meridian, Perplexity Tax, and Chime Tax, concluding that such competition would "likely show up in lower market share or in lower average revenue per user" for Intuit. Goldman also highlighted the stark contrast between Defendants' prior guidance that Mailchimp would return to double-digit growth in fiscal 2026 and the Company's May 20, 2026 disclosure that Mailchimp's revenue had instead declined year-over-year. According to Goldman, Mailchimp's growth was likely to "move down by another step" as a result of increasing competition and Intuit's recent workforce reductions.

46. Intuit's stock price continued to deteriorate in the weeks following the May 20, 2026 corrective disclosures, reaching a low of $255.07 per share on June 25, 2026. From its Class Period high of $807.39 per share on July 30, 2025, Intuit's stock price had declined by approximately 68%.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

47. During the Class Period, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statement they issued or disseminated to the investing public during the Class Period were materially false or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such

statements and documents as well as actions intended to manipulate the market price of Intuit common stock, as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Intuit and their control over, receipt, and/or modification of Intuit's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

48. Defendants knew or recklessly disregarded the false and misleading nature of the information regarding the safety of their platform, and the financial impact of the global roll out of the Company's age verification software, that they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

49. Given their positions within Intuit, the Individual Defendants controlled the contents of Intuit's public statements during the Class Period. The Individual Defendants were each provided with, or had access to, the statements alleged herein to be false and misleading prior to, or shortly after their issuance, and had the ability as well as the opportunity to prevent their issuance or cause them to be corrected.

50. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading. As a result, each of the Defendants is responsible for the accuracy of Intuit's corporate statements, and is, therefore, responsible, and liable for the representations contained therein.

51. Defendants' scienter is further supported by suspicious insider trading by the Individual Defendants and other senior Company executives. The timing and magnitude of these sales were highly unusual. During the approximately one-month period between December 3, 2025 and January 7, 2026, Defendants Goodarzi and Aujla, together with Cook, collectively sold 537,798 shares for proceeds exceeding $356 million. By comparison, during the preceding ten

months of the Class Period, these same insiders collectively sold only 322,678 shares for proceeds of approximately $213 million.

## VIII. LOSS CAUSATION

52. Plaintiff and other class members were damaged as a result of Defendants' fraudulent conduct as alleged herein. During the Class Period, Defendants engaged in a scheme to deceive investors by issuing a series of material misrepresentations, and omitting material facts and uncertainties required to be disclosed, relating to Intuit's operations, business, financial performance, and prospects.

53. As a direct result of Defendants' scheme, misrepresentations of material fact, and omissions of material fact, the price of Intuit's common stock was artificially inflated throughout the Class Period.

54. Class members unknowingly and in reliance on Defendants' materially false or misleading statements and/or omissions purchased Intuit common stock at artificially inflated prices on the NASDAQ. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiff and other class members would not have purchased Intuit common stock at the artificially inflated prices at which it traded during the Class Period.

55. The truth regarding Defendants' fraud was revealed through corrective disclosures made on and between May 21, 2026 and June 2, 2026. In response to these corrective disclosures, the price of Intuit's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct was removed from Intuit's stock price.

56. This decline in Intuit's stock price following the corrective disclosures is directly attributable to the market absorbing information that disclosed the falsities in or misleadingly omitted from Defendants' material misrepresentations and omissions.

57. Plaintiff and other class members suffered economic losses as the price of Intuit's stock fell in response to the corrective disclosures. It was foreseeable that such disclosures would cause Intuit's stock price to decline. Thus, Defendants' wrongful conduct, as alleged herein, directly, and proximately caused the damages suffered by Plaintiff and other class members.

## IX. NO SAFE HARBOR

58. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. Many of the specific statements pled herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of Intuit who knew that those statements were false when made.

## X. PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

59. At all relevant times, the market for Intuit common stock was an efficient market for the following reasons, among others:

a. Intuit common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, national stock market;

b. as a regulated issuer, Intuit filed periodic public reports with the SEC;

c. Intuit regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Intuit was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

60. As a result of the foregoing, the market for Intuit common stock promptly digested current information regarding Intuit from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Intuit common stock during the Class Period suffered similar injury through their purchases of Intuit common stock at artificially inflated prices and a presumption of reliance applies.

61. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Intuit between February 25, 2025 and June 1, 2026, inclusive.

63. Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of Intuit, members of Intuit's Board, and members of their immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; (iv) any entity in which Defendants have or had a controlling interest; and (v) any affiliate of Intuit.

64. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intuit's securities were actively traded on the NASDAQ. While the exact number of class members is unknown to Plaintiff at this time and

can only be ascertained through appropriate discovery from Defendants, Plaintiff believes that there are at least hundreds, if not thousands, of members in the proposed Class. Class members may be identified from records maintained by Intuit or its transfer agent and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

65. Plaintiff's claims are typical of all other class members' claims, as all class members are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws complained of herein.

66. Plaintiff will fairly and adequately protect the interests of the class members and has retained counsel competent and experienced in class and securities litigation.

67. Common questions of law and fact exist as to all class members and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the class are: (i) whether Defendants' acts and omissions as alleged herein violated the federal securities laws; (ii) whether Defendants' statements to the investing public during the Class Period misrepresented or omitted material facts about Intuit's operations, business, performance, and future prospects; (iii) to what extent the class members have sustained damages; and (iv) the proper measure of such damages.

## XII. CLAIMS FOR RELIEF

### COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

68. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a. employed devices, schemes, and artifices to defraud;

b. made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Intuit common stock during the Class Period.

70. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Intuit common stock. Plaintiff and the Class would not have purchased Intuit common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

71. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Intuit common stock during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**Against the Individual Defendants**

72. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73. The Individual Defendants acted as controlling persons of Intuit within the meaning of Section 20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of Intuit stock, the Individual Defendants had the power and authority to cause Intuit to engage in the wrongful conduct complained of herein. Intuit controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained

as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

b. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

c. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 17, 2026

Respectfully submitted,

*/s/ M. Elizabeth Graham*
M. Elizabeth Graham (SBN 143085)
**GRANT & EISENHOFER P.A.**
2325 Third Street, Suite 329
San Francisco, CA 94107
Tel.: (415) 229-9720
Fax: (415) 789-4367
egraham@gelaw.com

Karin E. Fisch (*pro hac vice* forthcoming)
Vincent J. Pontrello (*pro hac vice* forthcoming)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue
New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
kfisch@gelaw.com
vpontrello@gelaw.com

Phillip Kim (*pro hac vice* forthcoming)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel.: (212) 686-1060
Fax: (212) 202-3827
pkim@rosenlegal.com

*Counsel for Plaintiff*